Filed 2/11/16  P. v. Wallin-Reed CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| THE PEOPLE, | C075351 |
| Plaintiff and Respondent, | (Super. Ct. No. F1100498) |
| v. | |
| GREGORY CHAD WALLIN-REED, | |
| Defendant and Appellant. | |

Armed with a handgun and an assault rifle, defendant pursued a car occupied by six young men who had taken solar light fixtures from the front of defendant's rural property in Plumas County on two successive nights.  As he followed in the darkness, defendant fired multiple shots at the fleeing vehicle.  Defendant would later tell investigators that he saw muzzle flashes and heard the sound of gunfire coming from the victims' vehicle during the chase.  Near the end of the 7.7-mile pursuit, the victims turned onto a dirt road which led into a meadow, but then doubled back toward the paved road.  As they passed by defendant, he fired his assault rifle multiple times into the victims' vehicle, striking the driver and two of the passengers.  The driver died.

1

A jury found defendant guilty of murder in the first degree (Pen. Code, § 187),[1] discharging a firearm at an occupied vehicle (§ 246), five counts of assault with a firearm (§ 245, subd. (a)(2)), and possession of an assault weapon (former § 12280, subd. (b); see now § 30605). The jury also found true an enhancement for personal use of a firearm causing death on the murder count (§ 12022.53, subd. (d)), enhancements for personal use of a firearm (§ 12022.5, subd. (b)) on each of the assault counts and the discharging a firearm at an occupied vehicle count, and enhancements on two of the assault counts for the personal infliction of great bodily injury (§ 12022.7, subd. (a)). The court sentenced defendant to 50 years to life, plus a determinate term of 34 years.

On appeal, defendant asserts that the trial court abused its discretion in refusing to allow into evidence an undated photograph posted on the Facebook page of one of the occupants of the vehicle, John Chanley, almost seven months after the shooting. John Chanley did not testify at trial. The photograph shows Chanley holding a large knife with what appears to be a handgun tucked into the waistband of his pants. According to defendant, the photograph was relevant to prove that one of the occupants of the victims' vehicle had access to and was armed with a firearm on the night of the incident, supporting his claim that one of that vehicle's occupants shot at him first and that he had acted in self-defense. He further claims that the photograph was relevant to the credibility of one of the other occupants, Cesar Gonzalez. When interviewed after the shooting, Gonzalez stated to law enforcement that he and his friends did not have guns because they were " 'not like that' " and they were just " 'a whole bunch of kids.' " Defendant also asserts that there are four errors on the abstract of judgment.

We conclude that the trial court did not abuse its discretion in refusing to admit the photograph, and that, even if this evidentiary ruling was error, the error was harmless.

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

However, we agree with defendant, as do the People, regarding the four errors appearing on the abstract of judgment. Accordingly, we direct the preparation of an amended abstract of judgment to correct these four errors, and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The People's Case

On Friday night, July 1, 2011, Rory McGuire, Justin Smyth, Robert Osornio, John Chanley, Tommy Chanley, and Joe Crawford went to Antelope Lake looking for a party. Having failed to find the party, they headed home in the early morning hours of July 2. On the way home, McGuire stopped his car in the road in front of defendant's cabin. Tommy Chanley pointed out a sign posted on defendant's property which read: " 'Warning. You are entering the R.O.C. This is a restricted area. Only red-blooded patriotic Christian Americans are authorized for access upon approval and verification of credentials by the commanding authority. The use of deadly force is authorized for use on those found in noncompliance with above.' " According to Craig Schermerhorn, a friend of defendant, "R.O.C." stood for "Republic of Chad," "Chad" being the name that defendant goes by. Tommy pointed out a second sign as well. After Tommy shone a spotlight they had in McGuire's car on the sign, Joe Crawford got out of the car, removed one of the signs, stole a solar light from defendant's property, and returned to the car. McGuire then drove the group back to Susanville.

Schermerhorn and his wife Jennifer were staying on defendant's property in their pop-up trailer over the July 4th weekend in 2011. On Saturday morning, July 2, defendant told Schermerhorn that someone had stolen a solar light from his property the night before and that there was "suspicious activity at the entrance to [defendant's] property and around [Schermerhorn's] trailer." He told Schermerhorn that he had seen someone shining a spotlight on his property. Defendant and Schermerhorn located multiple footprints that did not match the shoes worn by defendant or the Schermerhorns.

3

On the afternoon of Saturday, July 2, 2011, McGuire, Smyth, Osornio, the Chanley brothers, and Cesar Gonzalez met in Susanville for a barbecue. After the barbecue, they decided to go to Antelope Lake to meet up with some girls. All six went in McGuire's vehicle. That vehicle did not have license plates. McGuire drove and Gonzalez rode in the front passenger seat. Seated in the back seat, from the driver's side to the passenger side, were Smyth, Osornio, John Chanley, and Tommy Chanley. They brought a bottle of blueberry vodka and some 40-ounce beers. They planned to stay at Antelope Lake for the night.

On Saturday evening, defendant did some target shooting on his property with an AR-15-style assault rifle equipped with a laser sight. When he was finished shooting, defendant set the rifle down on the porch. Defendant, his family, the Schermerhorns, and another couple who were staying on the property for the weekend were nervous because of what had occurred at the property the night before.

On the way to Antelope Lake Saturday night, McGuire again stopped in front of defendant's property. Schermerhorn observed the vehicle and alerted defendant. Gonzalez got out of McGuire's car to steal a solar light from defendant's property. Defendant grabbed his AR-15 and fired a warning shot "down range" and into the air. Gonzalez and Smyth heard the gunshot, Gonzalez got back in the car, and McGuire sped away. Defendant, who was still holding the AR-15, went to his truck and drove away quickly. Schermerhorn subsequently heard two or three gunshots fired at a distance. He then went to his trailer and retrieved a .40-caliber Beretta he kept for protection, but he stayed at defendant's property.

After McGuire had driven a half a mile to a mile, the passengers saw headlights behind McGuire's vehicle and realized that they were being followed. Smyth observed a green laser light shining from the vehicle behind them through their rear window. Gonzalez saw the green laser and then a red laser. They then heard shots and the sound of bullet strikes. Gonzalez testified he heard many shots, then a pause as if the shooter

4

were reloading, and then more gunshots. After the gunfire began, Gonzalez shone the spotlight at defendant in an effort to blind him. Gonzalez said his head and upper body were outside of the front passenger window when he aimed the spotlight rearward. When Gonzalez heard a bullet whiz by his head, he determined that what he was doing was not a good idea and brought the spotlight back into the car. Thereafter, the passengers threw the solar lights out the window. Gonzalez then waved a white shirt out the window to signal their surrender. Defendant did not stop shooting.

McGuire missed a turn and drove onto a dirt road in a meadow. After McGuire made a U-turn to return to the paved road, the McGuire vehicle and defendant's truck passed each other traveling in opposite directions, and multiple gunshots fired in rapid succession struck the McGuire vehicle. According to Gonzalez, "gunshots unloaded into the car." Several windows shattered and exploded. McGuire was struck, Smyth was shot in his right calf, and Osornio was shot in his right leg. With McGuire suddenly unresponsive, Gonzalez moved McGuire's leg and depressed the brake pedal with his hand. The car came to a stop off of the road. The Chanley brothers and Gonzalez then exited the car and ran.

Defendant approached the McGuire vehicle holding a rifle and stated, " 'You motherfuckers come by my house and shoot. I got kids,' " or something similar. Osornio and Smyth both responded that they had not shot at defendant's house. Smyth and Gonzalez both testified at trial that no one in McGuire's vehicle had a gun or any type of weapon, and that none of them had shot at defendant's house. Smyth testified that they had not shot at defendant's house the night before either. Smyth pleaded with defendant to call an ambulance. Defendant walked around McGuire's vehicle, returned to his vehicle, and left.

After defendant departed, the Chanley brothers and Gonzalez returned. They removed McGuire from the driver's seat because "he was in bad condition . . . ." He was unresponsive, he was missing fingers from his left hand, and "it was pretty apparent that

5

there was something seriously wrong." Occasionally McGuire would speak, but he was largely incoherent. Smyth's leg was bleeding substantially. He fashioned a tourniquet from his belt and applied it above his knee. Gonzalez attempted to start the vehicle, but it would not start. The car's oil pan had been ruptured on a rock in the meadow and had leaked a trail of oil. No one's mobile phone had service. The group decided that Gonzalez and Tommy Chanley would run to try to find help. Gonzalez and Tommy Chanley left, and, after running for a long time, they found a trailer near a campsite at the lake. The occupants did not have mobile phone service, but offered to take Gonzalez and Tommy Chanley to the campground. At the campground, they spoke with the camp host.

When defendant arrived back at his cabin, he told Schermerhorn that he may have killed someone. Defendant did not tell Schermerhorn that anyone had shot at him. Between 15 and 30 minutes later, defendant drove to the bottom of the Janesville Grade to report the incident. Defendant met with Sheriff's Deputy Juan Cervantes and Department of Fish and Game (now Department of Fish and Wildlife) Warden Kyle Kroll. Defendant told Cervantes he may have shot someone. Cervantes directed defendant to wait for the next available deputy. Defendant warned Cervantes, "Be careful. There may be kids out there with guns." He said the kids "possibly" had firearms, but did not say he had been shot at. Cervantes and Kroll left for Long Point Campground.

Cervantes and Kroll met Gonzalez and Tommy Chanley at the campground. Both seemed "very scared." Gonzalez and Tommy Chanley directed the authorities to the location of McGuire's vehicle. Two to three hours after Gonzalez and Tommy Chanley first left the meadow, law enforcement arrived at the scene.

Sergeant Todd Johns arrived at the meadow with two Department of Fish and Game officers as well as members of a film crew who had been in the area filming for *Wild Justice*. Johns secured the scene and then attempted to render first aid. Other emergency personnel responded. Detective Chris Hendrickson interviewed both

6

Gonzalez and Tommy Chanley.  A recording of his interview with Gonzalez was played for the jury.  We discuss that interview, *post*.

Deputy Steve Clark met defendant at an arranged location.  Clark interviewed defendant, and recorded the interview.  Clark's interview with defendant was played for the jury.  Defendant described getting in his vehicle and chasing the McGuire car after its occupants took his solar lights.  He claimed he saw muzzle flashes from the McGuire vehicle during the chase, and stated that he thought someone in that vehicle was shooting at him as well as shining the spotlight at him.  He stated that he continued to follow the car after it turned onto a dirt road and made a U-turn in an effort to "ditch" him.  Defendant said he then pulled out his pistol, and he shot.  He then stated, "And I swear to God I killed the kid."  Defendant continued, "[T]hey turned.  I nailed 'em through the windshield.  They went down about a quarter mile, car went off the side of the road and I pulled up and I got out and I had my pistol out."  Defendant, described his verbal exchange with the occupants of the McGuire vehicle:  "You know, 'You could [have] killed my kids,' and shit and they're like, 'Hey man.  We're sorry.  We give up.  We think our buddy's dead.'  And I looked over and I think I killed the driver."  Defendant said the person in the McGuire vehicle with whom he spoke stated that they did not have a gun.  Defendant continued to state that he believed he had killed one of the occupants of the McGuire vehicle, and then stated, "And I served five years in the flipping military and I killed people on the other side of this world.  And don't need to fuckin' kill kids in my state."

Sergeant Steve Peay and Detective Bill Elliot interviewed defendant in the early morning hours of July 3, 2011.  This interview was recorded, and the recording was played for the jury.  Defendant's account of the events in this interview was largely consistent with the account he reported to Clark.

Defendant told the investigators that he saw a person running off with two lights.  "So I ran off my deck and I said, 'I'm gonna go get these sons of a guns - or sons of a

7

bitches, is actually what I said." He said he caught up to them and was about 50 feet behind them when they shined a spotlight on him; he guessed they did that to distract him. Next he heard the report and saw flashes from a firearm, so he returned fire, firing four rounds from his handgun. The McGuire vehicle turned down a dirt road and made a U-turn in an effort to lose him. Defendant fired three shots, then got out of his truck. He said he saw the car "kinda I guess wreck," got back in his truck and "jammed after them." He said, "I got up to the car and I jumped out with my firearm and, uh, this kid he's, 'I give up. I give up man. I didn't mean to do anything.' I was like, 'What the fuck are you guys doing? I got kids up there. What the hell are you guys doing this for? What the hell did I do to you?' They were like 'We're just fucking around, didn't mean to do anything. I think our friend's dead.' I said, 'Jesus Christ. You scared the crap outta me.' And they're like, 'Please man, don't kill us.' And I went around to the driver's side. The kid was shot. The windshield - or the driver's side window was blown out. I said, 'You guys stay fuckin' here. Get some fuckin' help or something. I'm gonna go fuckin' call the cops. I could a fuckin' killed y'all.' I went back to the cabin. I said, 'Hey, I gotta fuckin' call the sheriff. I think I killed somebody.' That kid was fuckin' paying for his life."

Elaborating on what he said to the people at the cabin when he left to initiate the chase, defendant told the Sheriff's investigators someone at the cabin asked him what he was going to do and he responded, " 'I'm gonna go get these sons of bitches. I'm gonna fuckin' get their license plate or something.' " He said neither he nor the people who stole the lights fired any shots while he was at the cabin.

Defendant told the officer that the spot light and muzzle flash during the chase came from a person who was sitting in the right rear passenger seat. He said the guy was "leaning all the way out of the freaking car." Later, defendant said "the kid was leaning - like half his torso was leaning out of the window," and defendant said the kid had the spot light and something else in his hand, which defendant said he thought was a gun, but

8

could not be sure. Defendant indicated that when he walked up to the car at the end of the pursuit, this person was begging for his life. Defendant described this person as being a "young kid. Maybe 18, 19 years old." There was nobody in the front passenger seat at this time.

Describing the chase along the winding road between his cabin and the meadow, defendant stated, "I'm good at that. That's what the military trains you to do is to fuckin', you know, react. They train you to do that shit, react on foot, react on fuckin' cars." Defendant further stated, "Those kids didn't stand a fuckin' chance." Asked what he was thinking when he got out of his truck, defendant responded, "[H]ow fucked up these fuckin' kids are for doing this shit. Just fuckin' you snap into a fuckin' mode and it's like . . . ." He continued, "It's just I know I've been out for ten years, but fuck, you know, I was a fuckin' ranger."

Later, the investigators asked defendant additional questions about what happened after he fired the last shots at the McGuire vehicle. Defendant said after he fired at the car, "[t]hey went down then all of a sudden he went off the side of the road and it almost looked like he went into the fence. And that's when I rolled up on 'em and jumped outta the truck." Defendant said he parked his truck alongside the McGuire vehicle about five to ten feet apart, "right parallel with them." He "[t]hrew open the door and drew down on 'em." He was pointing his pistol at the occupants of the car, and the "kid" in the back seat was yelling, " 'Please don't kill us. We give up man. We give up.' " Defendant estimated he was within two feet of their car. Defendant said he then walked around the front of the McGuire vehicle and looked at the driver.

Defendant was asked why he approached the McGuire vehicle after it had come to a stop instead of leaving. "What . . . was going on inside your head at that moment . . . instead of taking off, splitting and - and, you know, cleansing yourself of any threat . . . you actually go to the threat?" Defendant responded, "I guess that's what you're trained to do. [¶]. . . [¶] To neutralize the threat, to - to secure it. [¶] . . . [¶] If - if you're

9

engaged you don't just fire rounds and walk away. You engage the objective. [¶] . . . [¶] And - and make sure that the objective is no longer a threat." Defendant said he did not know what the occupants of the car might do. He said he did not know if they might start shooting at him or go back to his cabin and kill his kids.

When asked to explain how the occupants of the McGuire car were a threat to his kids, defendant said that the night before he had heard an altercation, like somebody fighting, yelling, and cursing. He saw a car and heard a loud noise, which defendant said sounded either like them hitting something or a gunshot. Defendant admitted when they returned the next night and then took off, the threat was "[n]eutralized." He said he followed the McGuire vehicle to get the license plate number.

Later, discussing whether or not he could have been mistaken about being shot at during the pursuit, defendant stated: "[T]here's no way. When the guy has a spotlight shining at ya and it's a steady light and all of a sudden you see a flash and then the report." When asked whether he thought his truck had been hit by gunfire from the McGuire car, defendant responded that he did not think it had, and then added, "And - and the thing is, is this. Okay. I - I don't think about shit like that because you - you don't - you - ten years is a long time but still, you know, when shit happens after you've been through shit it's like boom, it's right there. You don't think about it. You don't f- you know, you're going along and all of a sudden you're engaged, your buddy goes down." He continued, "Your main objective is that you know don't drop and take care of your buddy. Your main objective is to push forward." Defendant had told the investigators he had the occupants of the car "dead to rights." When asked what he meant by that, defendant responded by saying, "What I am saying is that when I shoot - I'm good. [¶] . . . [¶] And I'm not bragging. I'm not saying - I'm good. I - I shoot a lot. I mean I - that's the fucked up part, you know? What - what - what do these kids have against me? I mean what - what - it's one thing when you're engaged in an enemy that's been trained in - in combat tactics. It's another thing where you got a kid that's just, you

know, shooting randomly or - or whatever." He later described going "into this zone . . . , " and continued, "I thought I was over this tough shit. . . . We'll go sit there and, you know, this - they talk about Post Traumatic Stress Syndrome and shit like that. I'm like, 'Yeah. I don't feel anything about that. Yeah. I think I'm just fine.' But every now and then you hear a song or somebody says something to you or something happens and it's like minutes of your life. You - they're gone because you - you go back to freaking memories." Defendant stated that he did not recall every detail of the incident because he "got into a zone, shit was happening. Shit was going down and [he] was reacting off of natural instinct. [His] trained instinct."[2]

In this interview, defendant indicated that the gun he used was a .380 automatic handgun which had been in his truck. Defendant said he changed magazines when he turned onto the dirt road. He said he thought the car might stop, and the occupants might get out and come at him. He repeated that he only fired three shots in the meadow. While he said he had the AR-15 in his truck, he did not mention shooting it during this interview. Detective Elliott was under the impression that defendant had only fired his handgun.

Towards the end of the interview, the investigators told defendant he did the right thing by calling the Sheriff. Defendant responded, "Nah. No, I - the right thing would have been to just fuckin' give it up and then call and say, 'Hey, you guys need to do some extra patrols.' "

---

[2] At the close of the defense's case, the court read into the record a stipulation. The stipulation stated: " 'Regarding the defendant's military records, the prosecution and the defense have stipulated that, one, the defendant is not an army ranger but worked and served in association with army rangers; two, defendant received extensive combat training during his years of service; and three, defendant did not serve in a designated combat theater of operations.' "

After their initial interview, Peay, Elliott, and defendant went to defendant's cabin. From defendant's cabin, Peay recovered the AR-15-type rifle, specifically a .223-caliber Bushmaster XM-15. It was equipped with a red-dot scope, a green laser on the right-hand side, and a light for nighttime illumination. Peay also recovered the 20-round magazine from the weapon, which contained four live rounds. Additionally, Peay recovered a Ruger .380-caliber handgun outfitted with a red laser. He also recovered two six-round magazines associated with the Ruger. One magazine was empty and the other contained two rounds. From the area in front of the cabin's deck, Peay recovered a single .223-caliber cartridge casing.

After leaving defendant's cabin, they drove the route to the meadow and defendant showed the investigators where he said he had exchanged gunfire with the McGuire car during the pursuit. Defendant had told the investigators he knew "exactly" where that had taken place. It was close to a place called Family Tree. Thereafter, they followed the route to the meadow. After the investigators and defendant arrived at the meadow, while law enforcement personnel were still on the scene, defendant was asked whether he ever shot his assault rifle. For the first time, defendant said that he had. Defendant stated that he first fired the AR-15 at the McGuire vehicle when the vehicles were coming off of the dirt road into the meadow. Then, when the McGuire vehicle turned around in the meadow, defendant "grabbed the AR and [he] swung it out the door and . . . popped off the rounds at them with the AR." He said he fired when the McGuire vehicle was "broadside" to him. Defendant estimated that he fired six or seven rounds from the AR-15. Defendant also acknowledged that, when he approached the stopped McGuire vehicle, it was the AR-15 he was holding and pointing at the occupants of that vehicle. He told the investigators that the .380 was in the truck and he was holding the AR-15 at that time because it was dark and the AR-15 had a light on it.

Later on July 3, while in custody at the Plumas County jail, defendant spoke to his father on the phone. The call was recorded. During the conversation his father indicated

12

he felt sorry for defendant, and defendant replied, "[I]t's not your fault, it's mine." He then added, "I just got freaked out by my kids, people screwing around, and I uh, I just uh, I just lost it. Just went in . . . [¶] . . . [¶] . . . went into a little bit of a zone. [¶] . . . [¶] So uh, and it got out of control . . . ." Defendant went on to say, "I let everyone down on this," and when his father replied, "Well, it's just . . . a shame," defendant replied, "Enough, I just had enough." While earlier in the conversation, defendant answered affirmatively to his father's question about whether what he did was self-defense, defendant never told his father that he had been shot at.

Detective Jeremy Beatley worked the crime scene in the meadow. He initially recovered seven .223-caliber cartridge casings. Two additional .223-caliber cartridge casings were located on the dirt road north of McGuire's vehicle. On July 13, he returned to the meadow and discovered one additional .223-caliber cartridge casing.

On July 6, Sergeant Matthew Beatley, participated in a search along the road between defendant's cabin and the meadow. He discovered one .380-caliber cartridge casing. He also found two .25-caliber cartridge casings along the road approximately five to ten feet apart. As he proceeded along the road towards the meadow, he discovered two more .380-caliber cartridge casings.

On July 16, 2011, Deputy Michael Grant participated in a search of the route from defendant's cabin to the meadow. Grant's team found five .380-caliber cartridge casings at different locations along the east side of the road. Three of the .380 casings were close together, two within one and one half feet of each other and the third within 10 feet of the two. They also found a solar light along the road. Grant's team also discovered several .17-caliber and .22-caliber rimfire cartridge casings. Grant testified that it was not uncommon to find shell casings on the route his team searched because a lot of people go to the area to shoot.

During the course of the investigation, Hendrickson and another detective drove the entire route from defendant's cabin to the meadow. It took them 10 minutes and 37

13

seconds to drive that route while traveling at speeds between 35 and 60 miles per hour. The distance was approximately 7.7 miles. They also measured the distance from the meadow to the trailer where Gonzalez and Tommy Chanley got a ride to the campground. That distance was 3.8 miles. Hendrickson testified that, in the course of his investigation, he discovered nothing that would confirm defendant's claim that the victims shot a gun from their car as they were being chased by defendant.

Allison Murtha, manager of the forensic department at RJ Lee Group (RJ Lee), which, among other things, performs analysis on gunshot residue tests, testified as an expert in the field of primer gunshot residue analysis. Murtha testified that there were three elements contained in gunshot residue: lead, antimony, and barium. Those three elements are present in the plume, or cloud of smoke which is created upon the discharge of a firearm, and condense together into single particles containing all three elements. Tests may reveal the presence of one-component, two-component or three-component particles. According to Murtha, the most important distinction among these particles is that one- or two-component particles may be from sources other than the discharge of a firearm, such as fireworks, brake dust, or the deployment of an air bag. One-component particles necessarily may come from an even broader range of sources. However, three-component particles can definitively be said to result from the discharge of a firearm.

On December 19, 2011, RJ Lee received five gunshot residue kits from the Plumas County Sheriff's Office. These kits contained the gunshot residue tests performed on the Chanley brothers, McGuire, Gonzalez, and Smyth.[3] Murtha testified that none of the kits contained three-component gunshot residue particles. However, the tests performed on McGuire, Gonzalez, Tommy Chanley, and Smyth revealed the presence of one- and two-

_____

[3] Sergeant Peay acknowledged that a gunshot residue test was not performed on Osornio. Peay testified that Osornio had been released from the hospital quickly and officers were not able to obtain a gunshot residue kit from him.

14

component particles. There were no results for the samples derived from John Chanley because the collection kit used to collect his samples was outdated, and RJ Lee no longer performed analysis on that type of kit.

Murtha testified that it would not be unusual for a victim who had been shot to have one- or two-component particles on them. She also testified that, if someone discharged a firearm in a particular location in close proximity to several individuals, and samples were taken from those individuals immediately thereafter, she would expect to find three-component particles in those samples. On cross-examination, Murtha acknowledged that the mere absence of three-component gunshot residue from all of the samples did not definitively establish that none of the individuals fired a gun or that none of them were in close proximity to a gun being fired.

John Brogden, an expert in the field of crime scene investigation employed by the California Department of Justice (DOJ), testified about his examination of the vehicles involved in this case. Brogden catalogued and recorded the apparent trajectories of the bullet strikes on McGuire's vehicle. Brogden testified that one .380-caliber bullet recovered in the trunk of McGuire's vehicle had struck the vehicle's tail light. Another .380-caliber bullet was recovered from the trunk area. There was also an apparent grazing bullet strike on the front windshield. There were three bullet holes on the driver's side of the vehicle. One went through the driver's side "A" pillar, which is the pillar near the side view mirror that separates the driver's side window from the front windshield. Another went through the rear portion of the driver's side window, which had been shattered, through the driver's headrest and probably exited through the open front passenger window. The other bullet went through the driver's side rear door in the area of the footwell. Brogden testified that, assuming that these bullet holes were caused by .223-caliber rounds fired by an AR-15, he would expect to find evidence of lead in the vehicle because ".223 rounds are notorious for fragmenting." He clarified that .223 rounds have small bullets that move very quickly, and when they strike an object, they

15

tend to fragment. The size of the bullet fragments could range from the size of the bullet down to microscopic fragments. Brogden testified that no cartridge cases were discovered in McGuire's vehicle. But he did find a spotlight, plugged into the cigarette lighter in the dashboard.

Brogden also examined and documented anything that could be characterized as a bullet strike on defendant's truck. There was some plastic molding that had been broken, and a couple of linear scratches on the hood of the truck. With regard to the broken plastic molding on the front grill of defendant's truck, Brogden testified that he examined the area behind it and the radiator and did not find evidence of impact one would expect from a bullet. He opined that this defect was not from a bullet strike. With regard to one of the scratches, Brogden testified that "it was not something that I perceived as a bullet strike. It's not consistent with a grazing blow at all . . . ." Also, the scratch tested negative for the presence of lead. Brogden also testified that a couple of marks on the driver's side front bumper of defendant's truck were not visually consistent with a bullet strike. A lead test on these marks also yielded a negative result. On cross-examination, Brogden acknowledged that he did not perform a test on these marks that would have detected the presence of copper, in which some bullets are jacketed.

Brogden observed three cartridge cases in the bed of the truck. Inside the cab, underneath the seat, Brogden found a box containing various ammunition. He also found a box of .380-caliber auto ammunition, five high-capacity magazines containing what appeared to be .223-caliber rounds, and numerous shotgun shells. Inside the truck, Brogden found one cartridge case in the center console area underneath a cup holder. He also found a cartridge case in the gap underneath a windshield wiper.

Don Dunbar, a senior criminalist with the DOJ, testified as an expert in the field of firearms examination and crime scene investigation, including detection of gunshot residue. Based on the tests he performed, Dunbar concluded that four .223-caliber cartridge cases recovered in the meadow were fired from defendant's Bushmaster AR-15

16

rifle, and five more found in the same location could have been. One .223-caliber cartridge case from north of the others in the meadow was fired from defendant's Bushmaster AR-15, and a second cartridge case found in that location could have been. Dunbar also examined the projectile recovered from McGuire's brain. It was the interior of the bullet, so it did not have any rifling markings on it to conclusively connect it to defendant's Bushmaster AR-15. But Dunbar did compare the interior design of the projectile to the .223 ammunition submitted with defendant's Bushmaster AR-15, and determined that the projectile from McGuire's brain was consistent with that ammunition. Dunbar testified that the bullet fragments recovered from the center console of McGuire's vehicle were also consistent with the style characteristics of the ammunition submitted with defendant's Bushmaster AR-15. Dunbar noted that the number of the width and groove impressions on these fragments was the same as that for ammunition fired from defendant's Bushmaster AR-15, but there was insufficient detail to opine whether those fragments had or had not been fired from defendant's weapon.

A bullet recovered from the trunk of McGuire's vehicle and a bullet recovered from the rear bumper of McGuire's vehicle were both .380-caliber bullets fired from defendant's .380 Ruger. Five of the eight .380-caliber cartridge cases recovered along the road between defendant's cabin and the meadow were fired from defendant's Ruger. A .380-caliber cartridge case recovered from inside defendant's truck was fired from defendant's Ruger.

Dunbar testified that the three .380-caliber cartridge cases found in a cluster together along the road between the cabin and the meadow were not fired from defendant's Ruger, although there were indications that they were fired from the same weapon. Dunbar testified that someone very proficient could fire a double-action semi-automatic handgun perhaps twice per second, and if such a person fired two shots per second from such a gun while traveling in a car at approximately 50 miles per hour, one

17

would expect to find the ejected cartridge cases at distances approximately 36 feet apart rather than a foot to a foot and a half apart.

As part of his work on the McGuire vehicle, Brogden applied sheets of filter paper to various parts of the McGuire vehicle for purposes of sodium rhodizonate testing, which reveals the presence of lead. The parties focused on FPS-2, an overlay that was draped over the window opening of the passenger-side front door with the window in the fully rolled down position. Part of the overlay was on the exterior and part was on the interior of the door.

Dunbar reviewed the sodium rhodizonate filter paper overlays. He testified that he was not surprised that these tests detected the presence of lead inside McGuire's car because several bullets had been fired into the car. Moreover, several of these shots were fired from a high-powered rifle, and .223-caliber bullets fired from such rifles tend to fragment when striking something hard. It is common to find large quantities of lead in an area into which a high-powered rifle bullet has been fired. Dunbar elaborated, "As the bullets break up, they expose the lead on the interior of the bullet, and the breaking up tends to spread the lead in different directions, depending on the angle and velocities it strikes at. So it's expected to find it in a vehicle that has been shot into like that." The upper part of FPS-2, which came from the interior of the front passenger door, had the classic pattern of particulate gunshot residue resulting from high-velocity bullets entering the passenger area of the car and fragmenting.

Dunbar testified that the lower pattern found on FPS-2, the filter paper overlay corresponding to part of the exterior front passenger door, could be from someone firing a gun nearby, but he testified that the pattern did not have the appearance of a vaporous nature he would expect to see under such circumstances. A vaporous pattern is one that does not involve separate particles striking the surface; rather it is "so finely dispersed that it is like a faint, cloud-like kind of pattern. It's even. It's difficult to see the separate little particles in there." This pattern did not have the appearance Dunbar would expect

18

to see from someone firing a gun in a close proximity.  It included some particulate-type pattern, and was not a true vaporous-type pattern.  Based on his review of the *Wild Justice* video showing emergency and law enforcement personnel opening or near the passenger side doors, Dunbar opined that this lead deposit could have been the result of transfer contamination of the lead from one location to the location from which FPS-2 was taken.

Dunbar performed an experiment whereby he attempted to duplicate the lead patterns found on the exterior portion of FPS-2 by firing three different handguns, including a .380-caliber pistol, next to the front passenger door of the vehicle, each from three different distances.  These tests did not result in any patterns like those found on the filter paper overlays taken from McGuire's vehicle.

Dunbar did not believe that the lead detected on FPS-2 resulted from a gun being fired from McGuire's vehicle.  Dunbar further testified that it would be difficult to produce the lead pattern present on FPS-2 by firing a gun pointed towards the rear of the vehicle because the weapon would have to be very close to the surface of the door and the side mirror would interfere with holding the gun in that location.  On cross-examination, however, Dunbar acknowledged that a gun could be fired perpendicularly at a pursuing vehicle from the passenger side window if the car was taking a right hand curve.  Further, Dunbar said he could not rule out any possibility of a gun being fired from outside the window of the vehicle.

Dunbar also examined filter paper overlays taken from the driver's side of defendant's truck.  No lead was discovered.

Thomas Morgan, a consultant with the R.J. Lee Group,[4] testified as an expert in the field of crime scene reconstruction, including gun powder residue and range determination. Morgan reviewed a number of materials, including the report prepared by defense expert Richard Ernest, which we discuss *post*. Morgan testified that the pattern on FPS-2 was consistent with particulate lead, perhaps from a projectile that fragmented and dispersed after moving through an object, resulting in a vaporous lead reaction. Morgan testified that it was not uncommon for a bullet that passes through a hard object, such as a vehicle's A-post or one of its windows, to fragment. Morgan opined that lead was discovered on the front passenger side of the vehicle because projectiles perforated the driver's side A-post and passed through the cabin toward the front passenger side. Morgan testified that such lead can be microscopic because, when a projectile strikes a hard object and fragments, some of the fragments can vaporize. Morgan acknowledged that the presence of the lead could result from an individual reaching a gun out the window, holding it between the side-view mirror and the A-post of the vehicle, and discharging it towards the rear of the vehicle. However, based on the pattern of the lead residue, Morgan's opinion was that the particulate lead on the right front passenger door was from projectiles entering the vehicle and fragmenting. Morgan also agreed that transfer was a possibility. Morgan disagreed with Ernest's conclusion that a firearm had to have been fired from McGuire's vehicle because Morgan found the lead-test results more consistent with particulate lead resulting from fragmenting projectiles entering the vehicle. Morgan did not believe that the evidence led to the conclusion that weapons other than defendant's must have been involved in this incident because, among other

---

[4] Morgan's full-time job was as a scientist for the Allegheny County Medical Examiner's Office in Pittsburgh, Pennsylvania, where he works in the firearms and tool mark section and part-time in the laboratory's mobile crime unit.

things, he could not exclude sportsmen or other individuals as the sources of the unidentified cartridge cases found by investigators.

Craig Fries, a specialist in three-dimensional laser scanning and computer animation, created scans of the meadow and mapped the route of the vehicle pursuit. Based on his mapping of the route using GPS coordinates and Google Earth, Fries testified that the three .380-caliber cartridge cases found clustered on the road, which were not fired from defendant's Ruger, were discovered approximately six-tenths of a mile from where defendant claimed someone in McGuire's vehicle had shot at him. The .25-caliber cartridge cases were discovered 2.88 miles from that location.

Based on the three-dimensional scanning of the meadow and various measurements, including the location of the cartridge cases ejected from defendant's AR-15 and the distance cartridge cases are ejected from that rifle, Fries concluded that, in the meadow, defendant was near the driver's side front door of his pickup truck at the time he fired that weapon. The evidence, according to Fries, was consistent with a person being in the driver's seat or at the driver's door of the truck. Fries further opined that, at the time defendant fired the AR-15 at the McGuire vehicle, the McGuire vehicle was at an 81-degree angle to defendant's truck, approximately 50 feet away. Fries described the angle as "close to perpendicular."

### Defendant's Case

Kerri Wallin-Reed (Kerri), defendant's wife,[5] testified that, in 2006, their cabin was burglarized. They reported the incident to the Plumas County authorities, but no one ever investigated the matter.[6]

---

[5] We use defendant's wife's first name to avoid confusion.

[6] In his testimony in the People's case, Schermerhorn testified that defendant kept a calendar on which he recorded break-ins that had occurred at the cabin. Schermerhorn had previously had a conversation with defendant in which defendant said local law

21

Kerri testified that on July 2, 2011, at approximately 2:30 a.m., she and defendant were both awakened by a noise outside of the cabin. They got up to investigate, and both observed a very bright light shining in and around the cabin. Defendant went to the front porch, and the light went away. Defendant and Kerri's children woke up and asked what was happening. Kerri and defendant were scared by the incident, and concerned for the safety of the family. This was not a normal occurrence at the cabin. However, Kerri testified that she did not recall hearing any type of gunshot that night.

On July 3, 2011, defendant went to Reno to obtain a new generator. While he was away, a vehicle came all the way up the driveway to the cabin. This was also a very uncommon occurrence.

After dinner, Kerri watched a movie in the cabin with the children. Defendant was on the porch with friends. Kerri fell asleep watching the movie, and later awoke and saw defendant get into his truck and drive away. Kerri next saw defendant when he returned. He was distraught and crying.

Richard Ernest, a forensic scientist for Alliance Forensics Laboratory, Incorporated, in Fort Worth, Texas, testified as an expert in the field of gunshot residue and residue analysis. In arriving at his conclusions, he analyzed photographs and reports prepared by others. Among other things, Ernest analyzed the gunshot residue reports prepared by the DOJ and RJ Lee, as well as the firearms analysis report prepared at the DOJ's laboratory.

Ernest observed that the three .380-caliber shell casings clustered together on the side of the road were not fired from defendant's handgun. Based on those cartridge casings and the other unidentified casings collected in this case, Ernest concluded that at

---

enforcement did not come to the cabin to respond to reports of break-ins, and that he did not expect help with such matters from law enforcement.

least four guns were involved: defendant's .223-caliber Bushmaster rifle, defendant's .380-caliber Ruger handgun, an unknown .380-caliber handgun, and a .25-caliber pistol.

Ernest testified that he did not observe evidence of bullet strikes on the passenger-side door of the McGuire vehicle, inside or out. Ernest did testify that it was within the realm of possibility that a bullet striking a different part of the vehicle could result in the lead detected in the area of the passenger-side door. However, Ernest testified that, under such circumstances, he would expect to discover evidence of some damage to that side of the vehicle or injury to the passengers riding on that side of the vehicle. Asked whether this meant that he could rule out the possibility that bullet strikes to other areas of the vehicle resulted in the presence of lead detected in the tests on the passenger side, Ernest responded: "I would say that it certainly leans that way. If there's no damage inside that car from bullets or bullet fragments over in that area and if that passenger, right front passenger, has not been struck by any bullet or bullet fragments, then that would lead indication [*sic*] that that didn't happen."

Asked a hypothetical question about whether a passenger seated in the front passenger side of a vehicle firing a gun towards the rear of the vehicle using his left hand would result in a pattern of residue consistent with that found on McGuire's front passenger door, Ernest responded: "It certainly could be consistent with that, and further, he doesn't just have to be firing rearward with that; he could in fact -- if the car is moving and there's wind blowing by that open window, he could be firing essentially straight out and he also could be firing with the gun somewhat inside that window inside the plane of where the window would be and firing outward from there . . . . And again, if he did such a thing, would we expect patterns somewhat similar to this? Yes."

Ernest testified that the gunshot residue RJ Lee looked for in performing their tests had nothing to do with bullet fragments. He further testified that, "whether it's a two-component or one-component particle, what RJ Lee has recognized here is that these particles came out of the barrel of a gun." Ernest further testified that, if an individual

23

fired a gun from where Gonzalez was seated in the front passenger seat of the vehicle, then traveled almost four miles on foot, and then rinsed his hands with water, Ernest would expect that the individual would have washed off the gunshot residue particles that might have been on his hands. Gunshot residue washes off fairly easily. Nonetheless, some of the particles actually detected through the gunshot residue test performed on Gonzalez could be explained if, after washing his hands, he came into contact with an object on which those particles had settled, such as his clothing or handling a firearm.

As he concluded his direct testimony, Ernest read from the report he prepared for this case: " 'In conclusion, it is the opinion [o]f this author, stated within a reasonable degree of scientific certainty, that an unknown and unrecovered firearm was discharged from the victim's vehicle.' " Ernest acknowledged other possibilities. However, based on the collection of cartridge cases not related to either of defendant's guns, the presence of elements on the McGuire vehicle consistent with gunshot residue from the firing of a gun, the RJ Lee gunshot residue test results, the absence of damage to the front passenger area of the McGuire vehicle, and defendant's statements that he was fired upon, Ernest believed that a gun was fired from the right front passenger area of the McGuire vehicle.

On cross-examination, Ernest acknowledged that he would "[p]robably not" expect to find the three .380-caliber cartridge cases which were not fired by defendant's Ruger within eight to ten feet from one another if they were fired from a vehicle traveling approximately 50 miles per hour. However, Ernest observed that, when cartridge cases are ejected from a weapon, they can travel and carom in unpredictable directions. Thus, Ernest did not "put a great amount of stock by exactly where the cartridge cases are found at a particular shooting scene . . . ." He also cautioned that one's perception of how fast one is traveling in a motor vehicle is often inaccurate. Ernest acknowledged that it was not uncommon for people to go out in rural areas and shoot guns, thus leaving behind cartridge cases. Ernest also acknowledged that it was not known whether certain cartridge cases were from bullets fired during the incident.

24

Also on cross-examination, Ernest acknowledged that, to create the pattern of residue found in a particular part of the McGuire vehicle by firing a gun backwards, the shooter would have had to place his arm out of the front passenger-side window and behind the side view mirror.

Ernest also testified that the fact that officers drew their weapons on Gonzalez and Tommy Chanley before subsequently handcuffing them at the campground gave rise to the risk of contamination with regard to one- and two-component particles.

**Verdict and Sentencing**

The jury found defendant guilty of murder in the first degree, discharging a firearm at an occupied vehicle, five counts of assault with a firearm, and possession of an assault weapon. The jury also found all charged enhancements to be true.

On November 21, 2013, the trial court sentenced defendant to 50 years to life, plus a determinate term of 34 years calculated as follows:  on count one, murder, an indeterminate term of 25 years to life plus a consecutive sentence of 25 years to life for the enhancement pursuant to section 12022.53, subdivision (d); on count two, discharging a firearm into an occupied vehicle, a consecutive determinate term of seven years plus a consecutive term of 10 years for the personal use of an assault weapon enhancement pursuant to 12022.5, subdivision (b); consecutive determinate terms of one year on each of the five assault counts plus consecutive terms of two years on the five enhancements for personal use of an assault weapon corresponding to those counts pursuant to section 12022.5, subdivision (b); consecutive terms of one year on the two enhancements for personal use of a firearm causing great bodily injury pursuant to 12022.7, subdivision (a); and a concurrent two-year term for possession of an assault weapon.

**DISCUSSION**

**I.    Exclusion of Facebook Photograph Offered by Defendant**

Defendant asserts that the trial court abused its discretion in excluding relevant evidence -- a photograph of John Chanley in which he is holding a large knife and has a

handgun tucked into his waistband[7] -- which defendant asserts would have tended to show that the victims possessed a firearm.  Defendant argues that the photograph contradicted Gonzalez's remarks in his interview with law enforcement, which was played for the jury, in which Gonzalez stated that he and his friends did not have a gun, were just " 'kids,' " and were " 'not like that.' "  Thus, according to defendant, the photograph was also relevant to Gonzalez's credibility.  Defendant contends that the photograph demonstrated that at least one occupant of the McGuire vehicle had access to a gun at roughly the same time as the incidents involved here.  Because a principal issue in the case was whether anyone in the McGuire vehicle shot at defendant as he pursued that vehicle in his truck, defendant contends that the Facebook photograph was relevant.  Defendant asserts that the mere fact that the photograph may not have been taken contemporaneously with the events at issue here should go to the weight to be accorded to the evidence, not its admissibility.  Defendant argues that the photograph was posted to Facebook "a reasonably short period of time after the July 2 shooting."  According to defendant, the trial court's refusal to admit this evidence deprived him of his right to present a complete defense.  Defendant further contends that the court's refusal to admit the photograph into evidence was prejudicial under any standard and that his convictions must be reversed.

We conclude that, because defendant could not establish when the photograph was taken, he did not establish that it was relevant. Accordingly, the trial court did not abuse its discretion in declining to admit it into evidence.  We further conclude that any error in excluding the photograph was harmless.

---

[7] For purposes of this appeal, we assume that the photograph does indeed show a handgun tucked into John Chanley's waistband.  However, we will note that this is not necessarily a certainty.  The object could be a replica or toy, an inoperable gun, or another object altogether.

26

## A. Additional Background

During his interview with Gonzalez hours after the shooting, which was played for the jury, Hendrickson asked Gonzalez if anyone in his group had a gun or shot at defendant, and Gonzalez responded that no one in the car had a gun. Hendrickson then asked, "What if we find bullet holes in his . . . truck?" Gonzalez responded: "You can find bullet holes anywhere you want. But there was no gun f- that we had. We're not like that. We're not, uh, we're a whole bunch of kids."

On cross examination, defense counsel asked Hendrickson if he had seen a particular photograph of John Chanley which had been posted to his Facebook page. This photograph had been marked for identification, but not admitted into evidence. The court ordered a recess and conferred with counsel at a sidebar conference.

The court observed that it had previously ruled that this photograph was inadmissible. Defense counsel argued that the People opened the door to admission of the photograph through Gonzalez's statement to Hendrickson that he and his friends did not have guns because they were "not like that." The prosecutor countered that there was no indication when the photograph was taken. The prosecutor also argued that the photograph was not relevant to credibility, to character, or to any other legitimate factor at issue. The court agreed that there was no information as to when the photograph was taken or what the circumstances were at the time. The court also observed that John Chanley had not testified. When asked at sidebar, Hendrickson could not recall when he accessed John Chanley's Facebook page. He thought he may have discovered the photograph one or two months prior to trial. The court observed that the photograph could have been taken as much as two years after the incident. The court ruled that the photograph was inadmissible. Defense counsel made an offer of proof, stating that, in response to Gonzalez's statements that his friends were not the type to have guns, the defense sought to prove that they were indeed the type to "go about armed and

27

menacing." The prosecutor again emphasized that there was no indication when that photograph was taken.

The court observed that it did not believe that there was any evidence of bullet holes in defendant's truck, and, therefore, the connection between the photograph and the trial evidence was tentative. The court further stated that the defense could not "take one sentence out of context and run with it." Finally, the court observed that there was no indication when the photograph was taken, by whom it was taken, or for what purpose. Without such foundation and authentication, the court declined to admit the photograph into evidence.

After her testimony for the defendant's case, and outside of the presence of the jury, the defense presented testimony from Kerri regarding the photograph. Kerri testified that, at counsel's request, she retrieved certain photographs from Facebook. Kerri testified that the photograph at issue here was dated January 25, 2012. On cross examination, Kerri acknowledged that it was her understanding that this date corresponded to the date the photograph was posted on Facebook. She did not know when the photograph was taken.

In argument following Kerri's testimony, defense counsel again asserted that the photograph was admissible to rebut Gonzalez's statements to the effect that his friends were not the type to have guns. The prosecutor objected on relevance grounds and noted that there was no indication as to when the photograph was taken. The court observed that the photograph was posted after the incident. The court again denied the defense's request to admit the photograph.

The defense filed a post-verdict motion for a new trial in which it raised, among other things, the issue of the photograph. The trial court denied defendant's motion, and specifically stated that he believed the prior ruling on the photograph was proper.

28

## B. Relevance

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) " ' "Evidence is relevant if it tends ' "logically, naturally, and by reasonable inference" to establish material facts . . . .' " ' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1058, quoting *People v. Clark* (2011) 52 Cal.4th 856, 892.) " '[T]he trial court has broad discretion to determine the relevance of evidence. [Citation.]' " (*Lopez*, at p. 1058, quoting *People v. Cash* (2002) 28 Cal.4th 703, 727.) Additionally, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.)

The crucial issue at trial was whether someone in the McGuire vehicle shot at defendant during his pursuit and thus created an imminent threat warranting a response with deadly force. The evidence presented on this point was contradictory. No gun or shell casings were found in the McGuire vehicle, and all evidence presented from individuals in that vehicle who testified indicated that no one in that vehicle was armed with a gun or shot at defendant. Detective Hendrickson testified that, in the course of his investigation, he discovered nothing that would confirm defendant's claim that the victims shot at him. None of the gunshot residue kits analyzed by RJ Lee revealed the presence of three-component gunshot residue on occupants of the McGuire vehicle. Conversely, while defendant did not testify at trial, in recorded statements to law enforcement, as well as in statements to a 911 operator, he reported that, during the chase from the cabin to the meadow, someone in the McGuire vehicle shot at him. Defendant

stated to Detective Elliott that he was "[o]ne hundred percent" certain that someone in the McGuire vehicle fired shots at him. Thus, in light of this contested issue, which was certainly of consequence to the determination of the case, evidence that had a tendency in reason to prove that an occupant of the McGuire vehicle had access to and was armed with a gun *at the time of the incident* would be relevant. (Evid. Code, § 210.)

The photograph at issue shows John Chanley holding a large knife and it appears he has a handgun tucked into the waistband of his pants. However, as the parties discussed at length before the trial court, there is no indication as to when the photograph was taken. According to Kerri, it was posted to Facebook on January 25, 2012. However, she did not know when the photograph was actually taken, and there is no evidence in the record to establish this fact. Thus, the photograph could have been taken at any time prior to the incidents at issue here, with the only obvious limitation being John Chanley's apparent age as he was depicted in the photograph. On the other hand, the photograph could have been taken at any time after the incident at issue here, up to almost seven months thereafter.

We conclude that the fact that John Chanley was photographed with a gun at some indeterminate time, under unknown circumstances, does not have any tendency in reason to prove either that he or someone else in the McGuire vehicle had a gun on the night of the shooting, or that Gonzalez lacked credibility when he testified that his group of friends was just "a whole bunch of kids," and, with regard to possessing firearms, they were "not like that."

The cases defendant cites for the proposition that the timing of when the photograph was taken goes to the weight to be accorded the photograph rather than its admissibility are inapposite.

In *People v. Scott* (2011) 52 Cal.4th 452 (*Scott*), a witness had allowed the defendant, who had been living on the street, to live with him. The trial court permitted the prosecutor to elicit testimony from the witness about why he had subsequently asked

the defendant to leave. (*Id*. at p. 490.) The witness responded that he asked the defendant to leave because the defendant stayed out late at night and ignored his requests that he not do so. (*Ibid*.) According to the prosecution, in light of the fact that the charged offenses were committed at night, this testimony was relevant to establish the defendant's habit of roaming about late at night. (*Ibid*.) The defense argued that this testimony was irrelevant because it addressed matters that occurred " 'several months' " *before* the charged crimes. (*Ibid*.) On appeal, the California Supreme Court determined that the trial court did not abuse its discretion in admitting the testimony. (*Ibid*.) Our high court stated: "The fact that defendant tended to stay out late at night, and refused to modify his behavior on request, was relevant. This series of offenses was committed at night and some offenses continued into the early morning hours. The fact that the particular period about which [the witness] testified *predated the offenses* was a factor going to the weight, not the admissibility, of the evidence." (*Ibid*., italics added.)

*Scott* does not help defendant. In *Scott*, the time period pertaining to defendant's habit of staying out late predated the charged crimes. (*Scott, supra*, 52 Cal.4th at p. 490.) Here, the timing of the photograph is completely unknown. And it clear it was posted to Facebook nearly seven months *after* the shooting. Additionally, the evidence at issue in *Scott* pertained to habit. "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." (Evid. Code, § 1105.) " 'Habit' or 'custom' [fn. omitted] is often established by evidence of repeated instances of similar conduct." (*People v. Memro* (1985) 38 Cal.3d 658, 681, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) Here, defendant did not seek to introduce the photograph as evidence of habit or custom, nor would he be able to. Inasmuch as the circumstances of the photograph and when it was taken are wholly unknown, contrary to defendant's argument, the photograph is not relevant to establish John Chanley's access to or possession of a

31

handgun at the relevant time.  Therefore, unlike *Scott*, these matters go not to the weight to be accorded to the photograph, but rather to its very admissibility.

In *People v. Homick* (2012) 55 Cal.4th 816 (*Homick*), the defendant objected to the testimony of his sister, who testified concerning the childhood dynamics within their family, and specifically the defendant's domineering relationship with his younger brother.  (*Id.* at p. 868.)  The defendant objected to the introduction of this evidence on the ground that it was stale because his sister had few interactions with him and his brother in adulthood.  (*Ibid.*)  The trial court overruled the defendant's objection, concluding that the sister's lack of interactions with her brothers in adulthood went to the weight to be accorded to that evidence, not is admissibility.  (*Ibid.*)  On appeal, the California Supreme Court rejected the defendant's contention that this evidence was of little relevance due to his sister's limited interaction with her brothers in adulthood.  (*Ibid.*)  Our high court stated that this evidence "was clearly relevant to Robert Homick's defense that he carried out defendant's instructions in the instant case without necessarily understanding their purpose."  (*Ibid.*)  The *Homick* court stated that the sister's "limited interaction with her brothers as adults and, thus, her opportunity to observe their adult relationship, went to the weight, not the admissibility, of her testimony."  (*Ibid.*)

In *Homick*, the evidence concerning the relationship between the brothers when they were growing up was undeniably relevant to their relationship as adults.  Therefore, the question as to whether the defendant's sister's information conveyed in her testimony may have been stale or outdated went to the weight to be accorded to that evidence rather than its admissibility.  (*Homick, supra*, 55 Cal.4th at p. 868.)  Here, however, it cannot be concluded that the photograph was relevant to whether an occupant of McGuire's vehicle had a gun on July 2, 2011, because it is unknown whether the photograph was taken before or after the incident, how much time separated the two events, and what the circumstances were at the time the photograph was taken.  In the absence of any indication that the photograph would have "any tendency in reason to prove or disprove

32

any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210), the trial court properly determined that these matters went to the admissibility of the photograph, not its weight.

Accordingly, we conclude that the trial court did not abuse its discretion in denying defendant's request that the photograph be admitted into evidence. The court properly determined that defendant failed to make the requisite showing that this evidence was relevant.

## B. Prejudice

In any event, even if the trial court abused its discretion in declining to admit the photograph, we conclude that the error was harmless.

Defendant claims that harmlessness here must be considered under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711] (*Chapman*), because the preclusion of this evidence violated his constitutional right to present a defense. (See generally *Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 642].) The People counter that the trial court's evidentiary ruling did not infringe on defendant's right to present a defense, and that any error must be tested for harmlessness pursuant to the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Id*. at pp. 835-836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

We do not agree with defendant that this lone evidentiary ruling infringed on his right to present a defense. Defendant presented a vigorous case for self-defense. In addition to defendant's statements that someone in the McGuire vehicle took several shots at him, the defense presented Ernest's expert testimony to the effect that the one- and two-component particles found on the hands of the occupants of the McGuire vehicle were consistent with gunshot residue and having fired a gun, and that the lead detected on the exterior of the passenger-side door of that vehicle was consistent with a gun having been fired in close proximity thereto. Additionally, the defense contended the cartridge cases discovered on the road along the route between the cabin and the meadow which were not fired from defendant's weapons established that shots were fired from the McGuire vehicle. As to the credibility of Gonzalez, the defense had ample opportunity to confront and cross-examine him. Thus, we conclude that the evidentiary ruling excluding the photograph of indeterminate date and circumstances from evidence cannot be said to have violated defendant's right to present a defense. Therefore the harmlessness of any error in precluding the evidence is to be gauged under *Watson*.

The undisputed evidence demonstrated that, after defendant observed someone taking his solar lights, he pursued the McGuire vehicle in his truck, armed with a Bushmaster XM-15 .223-caliber rifle, a Ruger .380-caliber handgun, and multiple rounds of ammunition for both weapons. Defendant shot at and struck the McGuire vehicle at least twice with the handgun while continuing to pursue that vehicle along a route approximately 7.7 miles long, even after the occupants displayed a white flag. After McGuire veered onto a dirt road and performed a U-turn in an effort to return to the paved road, defendant fired numerous rounds from the Bushmaster XM-15 rifle into the *driver's side* of McGuire's vehicle from approximately 50 feet away. Defendant admitted that the car was trying to elude him after it made the U-Turn. Defendant killed McGuire and wounded Smyth and Osornio.

34

Notwithstanding the efforts of the defense to establish that one of the occupants of the McGuire vehicle was armed and shot at defendant as he pursued them, we conclude that the evidence overwhelmingly established the contrary. No gun was found in this case other than those used by defendant. Smyth and Gonzalez repeatedly denied that anyone in the McGuire vehicle had a gun or shot at defendant. None of the gunshot residue tests analyzed by RJ Lee yielded any three-particle gunshot residue. Detective Hendrickson testified that, in the course of his investigation, he discovered nothing that would confirm defendant's claim that the victims shot at him. The presence of lead in the McGuire vehicle was convincingly explained by Dunbar and Morgan as the result of vaporous and particulate lead resulting from the fragmenting of the rounds fired by defendant into the vehicle and/or transfer. As for Dunbar's belief the lead residue on the outside of the front passenger door was the result of transfer, we note that defendant was on that side of the vehicle, within two feet, immediately after he fired multiple shots from his hand gun and assault rifle and then circled around the front of the vehicle to take a look at McGuire, whom he had mortally wounded.

As for the defense theory that someone fired a gun from the front passenger seat of the McGuire vehicle based on the presence of lead on the outside of the front passenger door, that residue was in a location such that, if it were the result of a gun being fired backwards at a pursuing vehicle, the passenger would have had to reach outside of the window, positioned the gun very close to the door behind the side view mirror and aimed the gun rearward. Besides being extremely awkward and unlikely, this position was inconsistent with defendant's claim that the purported shooter in the McGuire vehicle had his entire torso hanging out of the window as he was shooting at defendant's truck. Further, while Gonzalez described that he was in a similar position when he shined the spotlight at defendant's truck, he must have been far enough toward the rear of the vehicle and away from the side view mirror that defendant believed the person was hanging out the back passenger door window. And defendant's statement concerning the

35

position of the purported shooter also undermined the theory that the shooter was somehow steadying the weapon on the door frame while shooting at him at a perpendicular angle as the McGuire car took right-hand turns. Furthermore, no bullet strikes were discovered on defendant's truck. The shell casings found along the road that defendant's expert sought to associate with the McGuire vehicle were not found in the location where defendant said he was shot at -- the location of which defendant said he was sure -- but rather they were found six-tenths of a mile and 2.88 miles away.

The actions of the occupants of the McGuire vehicle -- shining a spotlight, waiving a white "flag," fleeing on foot from the vehicle once it stopped in the case of the Chanley brothers and Gonzalez, not shooting at defendant when he walked up to the vehicle -- are not consistent with what would be expected of *armed* individuals being pursued and repeatedly fired upon.

Additionally, defendant's own actions, and his reflections upon them, do not appear consistent with one responding to an imminent and lethal threat posed by a gunman. Defendant pursued the McGuire vehicle almost eight miles. When the handgun he had fired proved ineffectual, defendant fired a fusillade of gunfire from his Bushmaster XM-15 assault rifle into the *driver's side* of the vehicle as that vehicle was, in defendant's words, attempting to "ditch," "dodge," or "lose" him. Defendant fired these shots at the driver's side, even though he told investigators the person who was shooting at him had been doing so from the passenger side. He did not fire at the vehicle immediately after it made the U-turn. Instead he fired at the driver's side when it was almost parallel to him at an angle that was almost perpendicular. At least two of the shots appear to have been targeted at the driver, who was struck in the head. When the car stopped, defendant "jammed after" it in his vehicle, pulled up alongside at a distance of five to ten feet, and then jumped out and positioned himself at a distance of approximately two feet from the vehicle, without apparent fear the occupants would

36

shoot at him during any of these maneuvers.[8] Then he departed from the scene without confirming that the occupants of that vehicle were not armed. These actions were inconsistent with a fear that someone inside of the car had a gun.

Also, defendant lied in two separate police interviews about the firearm he shot in the meadow, claiming that at that time he shot at the McGuire vehicle with his .380 pistol, and during the second interview, he claimed he only fired at the McGuire vehicle three times in the meadow. Nine .223-cartridge casings that were either fired from defendant's assault rifle or could have been fired from that weapon were found in the meadow. And it was only when defendant was brought back to the meadow, with law enforcement personnel still on the scene, that he admitted firing his assault rifle.

While defendant told the 911 operator he had been shot at, he did not mention that to the first deputy with whom he spoke. Instead, he told the deputy to be careful because there " 'may be kids out there with guns' " and that those kids "possibly" had firearms. Nor did he mention being shot at to Schermerhorn during the time he was at the cabin after the shooting. Later, when conversing with his father from the jail, again defendant did not mention he had been shot at.

Defendant admitted to investigators that he " 'fucked up' " and "should [have] just stopped"; and told his father he "just got freaked out by my kids, people screwing around, and [he] . . . just lost it. Just went in . . . ," "went into a little bit of a zone," "it got out of control . . . ," and that he "just had enough." As defendant acknowledged to the investigators, "the right thing [to do] would [have] been to just . . . give it up and then call and say, 'Hey, you guys need to do some extra patrols.' "

Overwhelmingly, the evidence established that several young men trespassed into the "R.O.C.," stole property from the premises and ultimately became the victims of

---

[8] At this time, Gonzalez was hiding by laying in the field nearby. He testified that had he had a gun, he would have shot defendant when he approached the McGuire vehicle.

" 'deadly force' " because of their transgressions, just as indicated on defendant's unique no-trespass sign. We conclude that, even if the trial court did abuse its discretion in declining the defense's request to admit the photograph into evidence, there is no reasonable probability that, had the court admitted the photograph, the jury would have reached a result more favorable to defendant. (*Watson, supra*, 46 Cal.2d at pp. 835-836.) Indeed, even had we accepted defendant's argument that he was deprived of his right to present a defense and thus determined that the *Chapman* standard applied, we would nevertheless conclude, based on the foregoing, that any error was harmless beyond a reasonable doubt. (See *Chapman, supra*, 386 U.S. at p. 24.)

## II.    Abstract of Judgment

Defendant claims, and the People agree, that the abstract of judgment contains four errors requiring correction. We agree as well.

On the indeterminate term abstract, both Box 5 (life with the possibility of parole) and Box 6b (25 years to life) are marked as the indeterminate term to which defendant was sentenced on count one. Because defendant was properly sentenced on count one to an indeterminate term of 25 years to life for murder in the first degree, only Box 6b should be marked.

Under the 11th item (other orders) on both the indeterminate and determinate abstracts of judgment, the aggregate determinate sentence is erroneously set forth as 34 years 8 months. This must be corrected to state the correct aggregate determinate sentence of 34 years, as set forth in Box 8 of the determinate abstract of judgment.

The joint abstract of judgment imposes a restitution fine of $10,000 and a suspended parole revocation fine of $10,000 on both the indeterminate and the determinate abstracts. Section 1202.4, subdivision (b), provides, in part, that, "[i]n every *case* where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record." (Italics added.) Section 1202.45

38

provides, "[i]n every *case* where a person is convicted of a crime and whose sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (Italics added.) Thus, where applicable, the statutes authorize a single restitution fine and a single parole revocation fine in each case. (See *People v. McElroy* (2005) 126 Cal.App.4th 874, 885.) Accordingly, the joint abstract of judgment must be corrected to show only one restitution fine of $10,000 and one suspended parole revocation fine of $10,000.

Finally, the abstract also imposes the fee for the pre-sentence report twice. That fee, too, may only be imposed once in each case. (See § 1203.1b, subd. (a).) Moreover, the parties correctly agree that the authority for the imposition of this fee is section 1203.1b, subdivision (a), not section 1203.1, subdivision (b), as set forth on the abstract of judgment. Thus, the abstract of judgment must be corrected accordingly.

**DISPOSITION**

The trial court is directed to prepare an amended abstract of judgment to: (1) strike the mark on Box 5 on the indeterminate term abstract of judgment; (2) correct Section 11 on both the indeterminate and determinate abstracts of judgment to set forth the correct aggregate determinate sentence of 34 years; (3) set forth only one $10,000 restitution fine and one $10,000 parole revocation restitution fine by deleting these fines from the determinate term abstract and setting them forth only on the indeterminate term abstract; and (4) set forth only one pre-sentence report fee, and specify that the authority for the imposition of this fee is section 1203.1b, subdivision (a). The clerk is directed to forward certified copies of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgment is otherwise affirmed.

                                                MURRAY_____, J.

We concur:

____BLEASE_____, Acting P. J.

____ROBIE_____, J.

40